## HIGHWAYS

**BUDGETARY ADMINISTRATION – POLITICAL SUBDIVISIONS – ALLOCATION OF HIGHWAY USER REVENUES TO SPECIAL TAXING DISTRICTS**

November 23, 2010

*Emanuel Demedis*
*County Attorney*

On behalf of the County Commissioners of Calvert County, you have requested our opinion as to whether certain special taxing districts established by the Commissioners pursuant to a public local law qualify to receive highway user revenues directly from the State for the maintenance of private community roads. In compliance with our policy concerning opinion requests from local governments, you provided your own legal analysis of the question. You stated that you believe that these particular districts do not qualify for direct funding, reasoning that a special taxing district must be a "body politic" to qualify for direct funding.

As explained below, we reach a similar conclusion, but for a different reason. In our opinion, the General Assembly did not contemplate an allocation of highway user revenues to a special taxing district unless the roads in the district are dedicated or otherwise entrusted to a public body or government agency.

## I

## Background

### A.    *Highway User Revenues*

Highway user revenues derive from an account within the State Transportation Trust Fund known as the Gasoline and Motor Vehicle Revenue Account. TR §§3-216, 8-402(a). It is the repository for funds from a variety of sources, including the motor vehicle fuel tax and certain revenue collected through the vehicle titling tax, vehicle registration fees, the corporate income tax, and the sales and use tax on short-term vehicle rentals. *See* TR §8-402(b).

The State has long shared revenues credited to that account with localities. Under various statutory formulas, portions of the revenues are allocated to Baltimore City, the counties, and various other local entities. TR §§8-403, 8-404, 8-405. The State Highway Administration ("SHA") is responsible for determining the appropriate amount to be distributed to each local entity under those formulas.

With respect to the counties, one-half of the available funds is allocated on the basis of county road mileage and the other half is allocated on the basis of vehicle registrations. TR §§8-403, 8-404.[1] For purposes of these computations, a "county road" is defined as "any public highway ... title to which or the easement for the use of which, is vested in a public body or governmental agency; and [t]hat is not a State highway or located in Baltimore City." TR §8-101(g). A separate formula allocates funds to Baltimore City. *See* TR §8-403.

Another formula allocates funds to each "eligible municipality" – defined as "any municipal corporation, special taxing district, or other political subdivision of this State other than a county or Baltimore City" that is "authorized by law to construct or maintain streets or roads." TR §8-401(c-1), (e). Thus, the phrase "eligible municipality" includes some local entities that are not municipal corporations. An eligible municipality is to request its share of highway user revenues from SHA in writing at least six months before the start of the fiscal year for which the money is desired. TR §8-405(a). As with the counties, the available funds are allocated on the basis of "county road" mileage and vehicle registrations in the municipality. TR §8-405.[2]

---

[1] The mileage formula is the ratio of a county's total mileage of county roads, excluding the mileage of county roads in eligible municipalities, to the total mileage of county roads in all of the counties, again excluding county roads within eligible municipalities. TR §8-404(b)(1). The vehicle registration formula is the ratio of the number of motor vehicles registered to owners with addresses in the county to the total number of motor vehicles registered to owners in all counties, again excluding addresses within eligible municipalities from both parts of the ratio. TR §8-404(b)(2).

[2] The mileage formula is the ratio of the mileage of county roads in the municipality to the total mileage of county roads located in eligible

(continued...)

Under the current funding formula, approximately 9% of the revenues go to local entities.[3] In particular, Baltimore City is to receive 7.9% of the Account in Fiscal Year 2011 and 7.5% in subsequent fiscal years. TR §8-403. The total share distributed to the counties is 0.5% in Fiscal Years 2011 and 2012 and 1.4% in subsequent fiscal years. *Id*. Municipalities are to receive 0.1% in Fiscal Years 2011 and 2012 and then 0.3% in subsequent fiscal years. *Id*. We understand that 148 "municipalities" received highway user revenues directly from the State during Fiscal Year 2010, including three special taxing districts located in Montgomery County.[4]

---

[2] (...continued)
municipalities throughout the State. TR §8-405(c)(1). The vehicle registration formula is the ratio of the number of motor vehicles registered to owners with addresses in the municipality to the total number of motor vehicles registered to owners with addresses in all eligible municipalities throughout the State. TR §8-405(c)(2).

[3] Prior to Fiscal Year 2010, 30% of the Account was allocated to Baltimore City, counties and municipalities. TR §8-403 (2008 Repl. Vol.). In the wake of the State's recent fiscal difficulties, the local share of highway user revenues was significantly reduced for Fiscal Years 2010 and 2011. The most recent adjustments were made as part of the Budget Reconciliation and Financing Act of 2010. *See* Chapter 484, §§9, 10, and 34, Laws of Maryland 2010. Under the current formula, in Fiscal Years 2011 and 2012, 23.0 % and 20.4 %, respectively, of the Account is to be distributed to the State's general fund; 68.5 % and 71.5 %, respectively, is to be used for the purposes for which Transportation Trust Fund monies can be used. The balance is distributed to local entities. In subsequent years, 19.3% is to be distributed to the State's general fund and 71.5% used for the purposes for which Transportation Trust Fund monies can be used, resulting in a balance of 9.2 % to be distributed to local governments. The General Assembly also expressed its intent that a working group formed to review transportation funding or local aid provide recommendations on the distribution of local highway user revenues beginning in Fiscal Year 2013. *See* Chapter 484, §35, Laws of Maryland 2010.

[4] Those districts were the Village of Drummond, the Village of Friendship Heights, and the Town of Oakmont. *See* 3 Montgomery County Code, chs. 65, 66, and 70. Each of these districts was established by the General Assembly before Montgomery County adopted charter home rule.

### B.  *Special Taxing Districts in Calvert County*

The General Assembly has authorized the Board of County Commissioners of Calvert County to establish special taxing districts by local ordinance.  Code of Public Local Laws of Calvert County ("PLL") §4-101 *et seq.*[5]  Under that law, the County Commissioners may establish a special taxing district upon petition by a homeowners association, as defined in the Maryland Homeowners Association Act.[6]  PLL §4-101(b)(1).  The boundaries of the district are limited to the land within the County over which the homeowners association has authority pursuant to a declaration filed under the Homeowners Association Act.  PLL §4-101(c).[7]  When a special taxing district is established, the County Commissioners "may levy and collect special taxes or assessments, on property in [the] district[] receiving special benefits" in order to pay, among other things, "the cost of furnishing, providing, and maintaining ... "[c]ommunity roads and streets ..."  PLL §4-101(a)(2)(i).[8]

---

[5] A public general law – Annotated Code of Maryland, Article 24, §9-1301 – also authorizes certain counties, including Calvert County, to establish special taxing districts for certain purposes. We understand that the County relied solely on its authority under PLL §4-101 *et seq.* in establishing the districts in question.

[6] Annotated Code of Maryland, Real Property Article ("RP"), §11B-101 *et seq*.

[7] Under the Homeowners Association Act, a declaration is an instrument recorded in the land records that authorizes the association to impose mandatory fees on lots, or owners and occupants of lots, in connection with the provision of services or some other benefit.  RP §11B-101(d).

[8] The enabling legislation also addresses the documentation that must accompany the petition from the homeowners association, the procedures for adoption of an ordinance establishing a special taxing district, the collection of taxes levied in the district, the transfer of funds to the homeowners association, and the use and monitoring of funds transferred to a homeowners association.  PLL §§4-101 through 4-104. The General Assembly recently amended the law to address the disposition of funds remaining in a special taxing district when it is terminated. Chapter 729, Laws of Maryland 2010, *adding* PLL §4-103(d).

You stated that two homeowners associations successfully petitioned for the creation of special taxing districts under this law.[9] According to your letter, most of the funds collected for these districts have been applied to providing and maintaining private community roads. You indicated that the community roads in the special taxing districts have been included in the County's road inventory for purposes of SHA's computation of the County's allocation of highway user revenues and that the County has shared a portion of those revenues with the homeowners associations.

## II

### Analysis

The question has now arisen whether a homeowners association in Calvert County may apply directly to SHA for a share of the State highway user revenues with respect to its special taxing district. In our view, the answer to this question turns on whether the special taxing district is an "eligible municipality" for purposes of the law governing highway user revenues and whether its roads qualify as "county roads" under that law.

### A.    Whether a Special Taxing District is an "Eligible Municipality"

As noted above, an "eligible municipality" is "a municipality authorized by law to construct or maintain streets or roads." TR §8-401(c-1). There appears to be no question that the special taxing districts in Calvert County are authorized by PLL §4-101 to maintain local roads. You question whether they qualify as "municipalities."

The term "municipality" is defined for purposes of the statute as "*any* municipal corporation, *special taxing district*, or other political subdivision of this State other than a county or Baltimore City." TR §8-401(e) (emphasis added).[10] While the phrase "special

---

[9] The two homeowners associations established as special taxing districts identified in your letter are Drum Point and Chesapeake Ranch Estates. *See* Code of Calvert County §136-24 *et seq*. (as amended by Ordinance 24-09) and §136-42 *et seq*., respectively.

[10] Somewhat redundantly, the term "political subdivision" also

(continued...)

taxing district" is not defined in the highway user law, the reference to "any" such district indicates that the General Assembly intended that the definition be broadly inclusive.

The legislative history of the definition of "municipality" also indicates that the phrase should be construed liberally.  Even before enactment of the highway user revenue statute, the General Assembly had authorized the allocation of gasoline tax revenues to support roads in special taxing areas, both by general legislation as well as by legislation applicable to specific counties.  *See* Article 89B, §§ 9(b) and 9A(2) (1939 and 1943 Supp.).  The General Assembly had also provided for direct allocations to individual municipalities.  *Id.*, §14A (Town of Midland).

In 1947, the Legislature first enacted a definition of "municipality" for purposes of the highway user revenue law.  The statute provided:

> [t]he word "municipality" shall mean *any* municipality, *special taxing area, district*, or other political subdivision of this State other than a county or Baltimore City.

Chapter 560, §14, Laws of Maryland 1947, *codified at* Annotated Code of Maryland, Article 89B, §9(g) (emphasis added).  Thus, as originally enacted, the definition encompassed a "special taxing area" as well as a "special taxing district."[11]  The Legislature has

---

[10] (...continued)
encompasses special taxing districts.  It is defined to include: "(1) [a]ny county or municipal corporation; and (2) [u]nless the context requires otherwise, *any* special taxing district."  TR §1-101(k) (emphasis added).

[11] At that time, constitutional home rule for municipal corporations was not yet available, the option of code home rule for counties was unheard of, and no county had yet adopted charter home rule.  As a result, the General Assembly would routinely enact and amend the charters for individual municipalities and public locals laws for every county.  The General Assembly also established special taxing districts by public local law – entities that provided some municipal services, but that apparently stopped short of general purpose governments and that were sometimes referred to as "quasi-municipal corporation[s]." *See Barlow v. Friendship*

(continued...)

used the phrases "special taxing area" and similar terms sometimes to refer solely to public entities and sometimes to encompass geographical areas not associated with a particular entity. *See* 89 *Opinions of the Attorney General* 107, 109 n.4 (2004). The reference in the definition to "any" special taxing district or area indicates that the General Assembly was using the phrase in this context without any special limitation. Moreover, when the Legislature has intended to limit the universe of special taxing districts to which a law applies, it has often done so explicitly. *See, e.g.*, Annotated Code of Maryland, Article 26, §1(b) (defining "governmental entity" as a special taxing district with specified characteristics).

After its initial enactment, the definition of "municipality" was reworded solely for stylistic purposes when it was recodified as part of the new Transportation Article in 1977. Chapter 13, §2, Laws of Maryland 1977. There was no evident purpose to narrow the definition. It has not subsequently been amended.

The special taxing districts formed in Calvert County pursuant to PLL §4-101 *et seq.* thus appear to fall within the definition of "eligible municipality" under the highway user revenue law. However, whether or not these special taxing districts qualify as "eligible municipalities" under TR §8-401, there is a more fundamental barrier to the direct allocation of highway user revenues to them.

### B.    *Whether the Roads in the Special Taxing Districts are "County Roads"*

---

[11] (...continued)
*Heights Citizens' Comm.*, 276 Md. 89, 92, 344 A.2d 415 (1975).

Several of these special districts continue to operate under local legislation enacted by the General Assembly. It is noteworthy that when the General Assembly amended the Express Powers Act applicable to charter counties and granted authority to create or modify special districts for any of the purposes enumerated in Article 25A of the Code, it excluded, subject to specific exceptions, authority to legislate for special districts governed by a citizen's committee or commission elected or appointed independently of the county council. Article 25A, §5(O). Thus, the General Assembly has retained for itself authority to legislate for such districts. *See Barlow v. Friendship Heights Citizens' Comm.*, 276 Md. at 90 n.1.

You indicated that the roads in question are private community roads. This raises the question whether a special taxing district, even if it qualifies as an "eligible municipality," may obtain highway user revenues if it has only private roads.

This question is distinct from whether it is appropriate to finance such roads locally through a special taxing district. Private community roads qualify for inclusion in a special taxing district under PLL §4-101 because a homeowners association has authority over them. Accordingly, they are appropriately financed through special local taxes or assessments levied in the district coincident with the homeowners association. PLL §4-101(a)(2)(i) and (c). But that does not resolve the eligibility of those roads for a subsidy from State highway user revenues.

Under TR §8-408(c), a municipality is authorized to spend highway user revenues for the "construction, reconstruction, or maintenance of roads and streets." The terms "road" and "street" are both defined to mean "highway." TR §8-101(o), (s). The term "highway" in turn is defined by the statute at some length, but without a clear indication whether it refers to public roads. TR §8-101(i).[12]

Other portions of the statute indicate that highway user funds are intended generally to finance public roads. The statutory allocation formulas for the distribution of funds to counties and

---

[12] "Highway" includes:

>    (1) Rights-of-way, roadway surfaces, roadway upgrades, shoulders, median dividers, drainage facilities and structures, related stormwater management facilities and structures, roadway cuts, roadway fills, guardrails, bridges, highway grade separation structures, railroad grade separations, tunnels, overpasses, underpasses, interchanges, entrance plazas, approaches, and other structures forming an integral part of a street, road, or highway, including bicycle and walking paths; and

>    (2) Any other property acquired for the construction, operation, or use of the highway.

TR §8-101(i)

municipalities do not take into account private community roads. Rather, they are based in part on the mileage of "county roads" within a county or municipality. TR §§8-404(b)(1), 8-405(c)(1). As noted earlier, a "county road" is a "public highway ... title to which or the easement for the use of which, is vested in a public body or government agency ..." TR §8-101(g). Thus, it is clear that the term does not extend to private community roads, even if such roads are accessible to the public. This suggests that State highway user funds distributed to municipalities are intended for public roads.

A review of the statute's legislative history confirms this conclusion. When the predecessor of the current statute was first enacted in 1947, a municipality's share of highway user revenues was based solely on the mileage of county roads in the municipality. Chapter 560, §14, Laws of Maryland 1947, *then codified at* Annotated Code of Maryland, Article 89B, §13(b). In other words, a municipality shared in highway user revenues only to the extent that it had "county roads." A special taxing district or other municipality without any county roads would receive no funds. Then, as now, the definition of "county road" clearly referred to public roads of a local government entity. *See* Chapter 560, §12, Laws of Maryland 1947, *then codified at* Article 89B, §1A(d) ("The term 'county roads' means *any* public roads, excluding State roads, and *including hard-surfaced or paved streets of municipalities* (except Baltimore City), title to which, or the easement for the use of which, is vested in a public body or governmental agency by grant, condemnation, or dedication. ...") (emphasis added).[13] The basis for this restriction is self-evident – absent a dedication or an appropriate easement, there could be no assurance that the roads would continue to be operated as public roads.

In 1968, the allocation formula for the local distribution of highway user revenues was modified to take account of motor vehicle registrations in each jurisdiction. Chapter 447, §3, Laws of Maryland 1968, *now codified at* TR §§8-404(b)(2), 8-405(c)(2). In our view, this change was not intended to allow highway user revenues to be used to subsidize private roads in municipalities. Rather, it appears more likely that the number of motor vehicle registrations was added to the existing formula as a proxy for the

---

[13] The definition was incorporated in the new Transportation Article without substantive change in 1977 and has remained so to this day. Chapter 13, §2, Laws of Maryland 1977.

relative use that the roads received – use that would necessitate the maintenance and reconstruction that the highway user funds were intended to finance.

It is also notable that the motor vehicle registration factor was simultaneously added to the formulas for both counties and municipalities. Yet, when the Legislature decided in 1979 to authorize a county to use the funds to maintain private roadways, it did so by separate specific legislation. *See* Chapter 195, Laws of Maryland 1979, *codified at* TR §8-408(b)(2)(ii) (authorizing use of highway user revenues for maintenance of private roads in Talbot County). Even then, the use of highway user revenues for that purpose was justified on the basis that the particular roads had been used by the public for 20 years or more. *See* Letter of Albert K. Wood, Talbot County Manager to Delegate William S. Horne (October 23, 1978).

Thus, in our view, only municipalities with "county roads" – that is, roadways for which the title or an easement is vested in a public body or governmental agency – may directly apply for an allocation of State highway user revenues.[14]

We understand that this interpretation is consistent with SHA's administration of the statutes governing the distribution of highway user revenues to local governments. An agency's interpretation of a statute it administers, though not binding on a court, ordinarily is entitled to considerable weight. *See, e.g., Crofton Convalescent Center, Inc. v. Dep't of Health and Mental Hygiene*, 413 Md. 201, 215, 991 A.2d 1257 (2010). Although there are a number of instances in which a community that has retained title and responsibility for maintenance of its roads, but has received highway user revenues through its county, it is our understanding that SHA has required such communities to grant some form of

---

[14] In 2007, the General Assembly also considered legislation which, among other things, would have expressed the intent of the Legislature that Calvert County accept an easement for public travel on highways in all special taxing districts and that such highways be included in the County's road inventory for purposes of calculating highway user revenues. *See* Fiscal and Policy Note on House Bill 1077 (2007). However, this legislation did not pass.

easement to the county government in order to qualify for such funding.[15]

### III

### Conclusion

In summary, it is our opinion that the special taxing districts identified in your requests are not entitled to a direct allocation of highway user revenues. Unless the roads in those districts are dedicated or otherwise entrusted to a public body or government agency, they do not qualify for highway user revenue funding.

Douglas F. Gansler
*Attorney General*

William R. Varga
*Assistant Attorney General*

Robert N. McDonald
*Chief Counsel*
*Opinions and Advice*

---

[15] We understand that, in determining allocations, SHA either omits community roads from a county's inventory or classifies them as "other public roads" that are open to unrestricted travel, but not included as part of any county, municipal, or other publicly owned road system. In order for a road to qualify for highway user revenue funding, SHA requires an easement granting public access.



# TALBOT COUNTY, MARYLAND
## COURT HOUSE
### EASTON, MARYLAND 21601

ALBERT K. WOOD
County Manager
Telephone 822-2807

October 23, 1978

Honorable William S. Horne
Stewart Building
Federal Street
Easton, MD 21601

Dear Bill:

As per our recent conversation, enclosed please find copies of Bills passed by the legislature with reference to Kent and Somerset Counties, both of which pertain to road maintenance.

What the County Council is seeking for Talbot County is a bill which would: 1) authorize them to provide minimal maintenance to private roads in the County that have been used by the public for a period of twenty years or more; and 2) authorize the Council to use highway user funds (gasoline tax money) to perform the above minimal maintenance. The term in years, as to public usage, may vary from time to time, but I think that the figure used by Somerset would probably be suitable as a beginning base.

If you have any questions concerning this matter, please do not hesitate to contact the writer.

Yours very truly,

Albert K. Wood
County Manager

AKW/ls

Enclosures

# Maryland Association of the Judges of the Orphans' Courts

Hon. Joyce M. Baylor-Thompson, President
Hon. Athena Malloy Groves, Vice President

Hon. Leslie M. Downs, Secretary
Hon. Penelope A. Keating, Treasurer

February 17, 2010

Judiciary Committee
House Office Building
Room 101
Annapolis, Maryland 21401-1912

To:    Honorable Joseph F. Vallario, Jr., Chair
       Honorable Samuel I. Rosenberg, Vice Chair
       All Committee Members

RE: **Testimony HB 417**

## Jurisdiction Of the Orphans' Court

The Orphans' Court is a court of limited jurisdiction. This court addresses all issues pertaining to wills and estate administration, including guardianships of the person and property for minors. This court is what you may call the "probate court," in that it makes decisions regarding an individuals' most precious assets, those that they leave after death to their love ones to cherish.

## The Constitution of Maryland & Reasons to Support HB 417

The current Constitution of Maryland, Article IV, Section 40 indicates two qualifications one must have to become an Orphans' Court Judge: a) that the individuals be citizens of the State and b) individuals be residents for the twelve months preceding in the City or County for which they may be elected. There is no requirement that an Orphans' Court Judge have any legal training or knowledge of the law to perform the job. In essence, someone could serve in this capacity that is illiterate, a high school drop out, even a criminal felon. There is nothing in the Constitution to prevent these people from running for the seat as an Orphans' Court Judge.

When the founders of this Constitution set this language in place, they had no idea that the duties of the Orphans' Court would evolve into a court where some of the most complex estate issues are decided, including decisions where the value could be millions of dollars in assets. The question is, would you want someone handling your assets and deciding on who gets what without any legal training or legal knowledge of the law?

The job of an Orphans' Court Judge requires one to have legal knowledge of the law. Many of the litigants that come before the court are individuals without legal counsel (pro-se). These individuals are looking to the judge to guide them through the maze of estate administration. It is not just having the judge make a simple decision as to who gets what, but all decisions that are made are legally based. An Orphans' Court judge must know the Rules of

Procedure, the Rules of Evidence, the Estates and Trusts Article of the Annotated Code in addition to having the ability to do legal research and legal writing. Many of the cases that come before this court overlap into other areas of the law such as property law, tax law, financial and commercial transactions laws, and family law. It is important for a judge to interpret the laws as they apply to the facts of each case. The art of reading case law and interpreting such case law is very difficult unless you have had training in this area. This court is required to use the same rules of law as any other court in the State of Maryland. For example: the Baltimore City Orphans' Court has addressed all issues in the estate of Marion I. Knott. The initial petition for probate was filed in 2003. This estate stayed open for an inordinate amount of time. There were over 300 docket entries on this estate. Many of the issues decided upon by the court involved estate questions spanning from the jurisdiction of the Orphans' Court to subject matters including but not limited to wills, trusts, standing of the parties, ademption of estate assets, discovery and sanctions. This case was appealed all the way up to the Court of Special Appeals and was remanded back to the Orphans' Court for further evidentiary proceedings. There were over 100 docket entries on issues of discovery alone. This case generated work beyond the normal confines of simple estate issues. This court has generated memorandums of law and orders of the court that involved an inordinate amount of research into other areas of the law that impact upon estate administration. Many of the memorandums in this case were 25-30 pages long, and involved a lot of case law research. It took approximately two years of legal fighting amongst the heirs before the court could permanently name a personal representative in this estate. The litigation in this estate was voluminous and the court has four thick files to prove it. The court is addressing more of these types of cases and it is necessary for that individual judge to know and adhere to the law.

HB417 is a rationally sound bill in that it allows for persons to sit on the bench that have had some legal basis or knowledge of the law. The bill recognizes the needs of Baltimore City without forcing other jurisdictions into a situation that may not be warranted. It is our understanding that the entire City delegation supports this legislation.

The Orphans' Court for Baltimore City is a full time court. Many of the other Orphans' Courts around the state are not full time courts. This court generates an enormous amount of work. This court has served as a leader to other Orphans' Courts around the state. Maintaining the integrity of the court is of utmost importance. Baltimore City Orphans' Court has traditionally had attorneys on its bench for the last 40 years. It is important that Baltimore City maintain the integrity and excellent reputation it has garnered throughout the state of Maryland. There is no backlog of work in the City Orphans' Court. Each judge is able to individually hear cases. If a non- attorney were to sit on the Bench in Baltimore City, that individually would slow down the work of the court, because that individual would not be able to sit by themselves, sign orders by themselves, or perform any of the legal matters without the assistant of an attorney judge. Baltimore City indicates that this individual would create a backlog of cases in its court. Each judge on the Baltimore City Orphans' Court can sit alone, whereas most other courts of similar jurisdiction must sit enbanc where two or more judges must sit at any proceeding in that court. The Maryland Association of the Judges of the Orphans' Court (MAJOC) in no way is endorsing diversity in the Orphans' Court, but in reality, diversity already exists from one jurisdiction to another. We see this bill as one that is necessary in order for Baltimore City to effectively address the needs of its court and the citizens of Baltimore City. Being that this

legislation affects a local jurisdiction, and Baltimore City Orphans' Court would be negatively affected without this legislation, the **MAJOC would urge passage of this legislation**. It is important for the citizens of each jurisdiction to feel confident and assured that when they come before the Orphans' Court, they will be coming before judges that are competent and have had some legal training. HB417 invites people to the table who have had such training.